Sheldon H. BLOOM, Stephen Brzica, M.D., Roger S. Colton, M.D., David W. Nelson, M.D. and John J. Norton, D.D.S., Plaintiffs,

v.

Mary Jo O'BRIEN, Commissioner of the Department of Health, State of Minnesota and Morris J. Anderson, Commissioner of the Department of Tax Revenue, State of Minnesota, Defendants.

Civ. No. 4–93–1202.

United States District Court, D. Minnesota, Fourth Division.

Dec. 30, 1993.

Terence M. Fruth, Paul M. Floyd, Douglas L. Elsass, and Fruth & Anthony, Minneapolis, for plaintiffs.

Hubert H. Humphrey, III, Atty. Gen. of Minnesota, and Jocelyn F. Olson, Asst. Atty. Gen., St. Paul, for defendants.

## BACKGROUND

DOTY, District Judge.

Plaintiffs are professional health care providers practicing in Minnesota. Plaintiff Sheldon Bloom is a pharmacist, plaintiffs Stephen Brzica, Roger Colton and David Nelson are physicians and plaintiff John Norton is a dentist. Defendants are Minnesota state officials being sued in their official capacities. Plaintiffs filed suit seeking a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, that Minnesota Statutes Section 295.53, subd. 3 is unconstitutional under the First and Fourteenth Amendments of the United States Constitution. The challenged statute is part of a recently enacted health care program known as "MinnesotaCare."

Beginning January 1, 1994, plaintiffs will be subject to the regulations established by Minnesota Statutes Sections 295.52 and 295.-53. Section 295.52, subd. 2 imposes a two percent tax on the gross revenues of health care providers. Section 295.582 allows health care providers to pass this tax along to consumers and their insurance companies. However, Section 295.53, subd. 3 prohibits the health care providers from itemizing the cost of the gross revenue tax on invoices. "A hospital * * * or health care provider must not separately state the tax obligation under section 295.52 on bills provided to individual

patients." Minn.Stat. § 295.53, subd. 3. Plaintiffs do not contest the constitutionality of the gross revenue tax itself. They do contend that this restriction on itemization violates their First Amendment right of freedom of speech and seek to enjoin the enforcement of the law pursuant to Rule 65 of the Federal Rules of Civil Procedure. Defendants contend that the prohibition of itemization is constitutionally permissible because it protects the public from misleading information.

## DISCUSSION

Plaintiffs challenge the Minnesota statute, alleging violations of the First and Fourteenth Amendments of the United States Constitution. The First Amendment provides in relevant part that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. It is well established that the Fourteenth Amendment makes applicable to the States the First Amendment's guarantee of free speech. *Douglas v. City of Jeannette,* 319 U.S. 157, 162, 63 S.Ct. 877, 880, 87 L.Ed. 1324 (1943); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 547, 95 S.Ct. 1239, 1241, 43 L.Ed.2d 448 (1975).

■ The court considers four factors in determining whether to grant the plaintiff's Rule 65 motion for a preliminary injunction:

1. Is there a substantial threat that the plaintiff will suffer irreparable harm if relief is not granted;

2. Does the irreparable harm to the plaintiff outweigh any potential harm that granting a preliminary injunction may cause the defendant;

3. Is there a substantial probability that the plaintiff will prevail on the merits; and

4. The public interest.

*Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc). The court balances the four factors to determine whether a preliminary injunction is warranted. *Id.* at 113; *West Publishing Co. v. Mead Data Cent. Inc.,* 799 F.2d 1219, 1222 (8th Cir.1986). The plaintiff bears the burden of proof concerning the four factors. *Gelco*

*Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987).

## 1. The Threat of Irreparable Harm

■ To satisfy the element of threat of irreparable harm, the plaintiffs must prove that harm will result without injunctive relief and the harm will not be compensable by money damages. Possible or speculative harm is not enough. The absence of such a showing alone is sufficient to deny a preliminary injunction. *Gelco,* 811 F.2d at 420; *Roberts v. Van Buren Pub. Sch.,* 731 F.2d 523, 526 (8th Cir.1984).

■ When deciding the propriety of issuing a preliminary injunction the court considers the type of harm plaintiffs allege will occur. The United States Supreme Court has recognized the special value of First Amendment freedoms. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). The Commissioners argue that plaintiffs must also show that the challenged law has some sort of "chilling effect" on the exercise of First Amendment rights. They cite *Hohe v. Casey,* 868 F.2d 69, 72–73 (3rd Cir.1989) for this proposition. In this case the court finds that the statute will have a chilling effect on plaintiffs' exercise of their First Amendment rights because they are subject to criminal sanctions if they issue bills itemizing the passed on costs of the gross revenue tax. A violation of Minn.Stat. § 295.53, subd. 3 constitutes a misdemeanor under Minn.Stat. § 645.241 (1992). A violation is punishable by up to 90 days in jail or a $700.00 fine or both. Minn.Stat. § 609.02, subd. 3. This court has recognized that, if choosing to exercise a First Amendment right will subject a plaintiff to criminal penalties, the threat of irreparable harm is established. *ILQ Investments, Inc. v. City of Rochester,* 816 F.Supp. 516, 521 (D.Minn. 1993). Such a showing meets the chilling effect required by *Hohe v. Casey. ILQ Investments,* 816 F.Supp. at 521. Thus, the court finds that the fist *Dataphase* factor weighs in favor of plaintiffs.

## 2. The Balance of Harm Between the Parties

■ The court must balance of potential harm to both the parties in deciding whether to grant injunctive relief. *Dataphase,* 640 F.2d at 114. The balance of harm must tip decidedly toward the plaintiffs to justify issuing a preliminary injunction. *See e.g., General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 624 (8th Cir.1987).

The potential harm to the plaintiffs is the loss of their First Amendment freedom of speech or the imposition of criminal sanctions if they violate the law. The potential harm to the Commissioners is more speculative. Plaintiffs do not seek to enjoin the collection of the gross revenues tax itself. Therefore, no state program or funding mechanism is at stake. The two percent tax on the health care providers' gross revenues will still be collected.

■ The Commissioners allege that the state's sovereignty will be harmed by an injunction. They cite a dissent in a Supreme Court opinion for the proposition that a federal court granting an injunction against a state law frustrates the state's exercise of its sovereignty. *Moore v. Sims,* 442 U.S. 415, 437, 99 S.Ct. 2371, 2384, 60 L.Ed.2d 994 (1979) (Stewart, J., dissenting). However, Justice Stewart's dissenting opinion in *Sims,* a case dealing with the abstention doctrine, hardly supports the Commissioners' case. The abstention doctrine recognizes that there are times when the federal courts should defer to state courts in the interpretation of an ambiguous state law, even when Constitutional issues are at stake. *See, e.g. Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (the desirability of allowing a state's highest court to interpret an ambiguous statute counsels abstention by federal court even when plaintiffs seek relief under the Equal Protection clause). The threat of the loss of sovereignty in such a situation is obvious because, given an opportunity, the state courts may well interpret an ambiguous statute in a constitutionally appropriate manner.

In his dissent in *Sims,* Justice Stewart went on to argue forcefully that respect of state sovereignty is not the guiding principle of federal jurisdiction. "[T]his sort of lesser affront to principles of comity and federalism is not one that justifies a federal court in refusing to exercise the jurisdiction over federal claims that Congress has entrusted to it." *Sims,* 442 U.S. at 437, 99 S.Ct. at 2384 (Stewart, J., dissenting). The federal district courts are clearly entrusted with "original jurisdiction of all civil actions arising under the Constitution ... of the United States." 28 U.S.C. § 1331. The court should not refuse to exercise this jurisdiction merely because state officials are the defendants in a civil action challenging the constitutionality of a state law. The question before the court is not one which turns on the ambiguity of a Minnesota statute which might counsel abstention. Further, the Commissioners' argument based on sovereignty should not be given great credence, as any alleged loss of sovereignty is highly speculative, and does not outweigh the very real loss of free expression which plaintiffs will suffer if the law is allowed to go into effect. Thus, the court finds that the balance of harms weighs heavily in favor of plaintiffs.

## 3. The Likelihood of Success on the Merits

■ In order for the court to grant plaintiffs' motion for a preliminary injunction, they must demonstrate a likelihood of success on the merits. In litigation involving free speech, the court would ordinarily first determine what type of speech is being restricted in order to determine what level of scrutiny to apply. *Board of Trustees of the State University of New York v. Fox,* 492 U.S. 469, 473–474, 109 S.Ct. 3028, 3031–3032, 106 L.Ed.2d 388 (1989). It is well established that "pure" speech is entitled to greater protection than is "commercial" speech. *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). Plaintiffs contend in the first instance that "pure" political speech is at issue, the Commissioners contend that the statute regulates commercial speech.

■ The United States Supreme Court has at times indicated that there is a "com-

mon sense distinction" between commercial and political speech. *Central Hudson*, 447 U.S. at 562, 100 S.Ct. at 2349; *City of Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). This distinction is based on an understanding of commercial speech as "speech proposing a commercial transaction." *Central Hudson*, 447 U.S. at 562, 100 S.Ct. at 2349. The Supreme Court recently said that the proposal of a commercial transaction is *"the test* for identifying commercial speech." *City of Cincinnati*, —— U.S. at ——, 113 S.Ct. at 1513 (emphasis original; citations omitted). The paradigmatic form of commercial speech is advertising. *Central Hudson*, 447 U.S. at 563, 100 S.Ct. at 2350. Indeed, it is the "informational function" of advertising which leads to the inclusion of commercial speech within protections afforded by the First Amendment. *Id.* However, merely providing non-commercial information in conjunction with the offer of a transaction does not convert essentially commercial speech into pure speech. *Fox*, 492 U.S. at 474–475, 109 S.Ct. at 3031–3032.

However useful it may be in other contexts, the common sense distinction between commercial and political speech breaks down in this case. The statute does not prohibit all speech concerning the gross revenues tax. Rather, it proscribes a very specific form of communication. Health care professionals may not state on an itemized bill the exact amount of the gross revenue tax that is being passed along to an individual patient. The itemized bill is indisputably part of a commercial transaction, but it does not propose a transaction as such. A bill is not a proposal that the patient pay for services already rendered, it is a demand for payment. Itemizing the specific dollar amount of the gross revenue tax being passed along to a patient would simply inform consumers that, in addition to charges for the medical service provided, they were also paying a share of the tax imposed on the health care provider.

The distinction between commercial speech and political speech in this case cannot be drawn based on whether the speech proposes a transaction. The speech involved concerns, but does not propose, a transaction. The proscribed speech will indicate that, in conjunction with the charges normally associated with a particular medical transaction, the consumer must also pay a specific amount of money which will help to compensate the health care provider for the cost the provider incurs because of the gross revenue tax. Because this charge is not imposed by the state on the particular transaction, but is a consequence of the gross revenue tax law, stating the amount charged to individual patients may well be construed as a political statement about the law as well as a commercial statement about what is owed. Thus, the proscribed speech may be political speech.

In his concurring opinion in *Central Hudson*, Justice Stevens noted that because commercial speech is afforded less protection "it is important that the commercial speech concept not be defined too broadly lest speech deserving of greater constitutional protection be inadvertently suppressed." *Central Hudson*, 447 U.S. at 579, 100 S.Ct. at 2358 (Stevens, J., concurring in judgment). The court finds this a persuasive reason to defer deciding until a trial on the merits whether the Minnesota statute implicates only commercial speech or political speech as well.

■■■■ At this procedural juncture it is appropriate to determine whether the statute is likely to withstand even the intermediate scrutiny applied when commercial speech is implicated. The constitutional test as articulated in *Central Hudson* and subsequently clarified in *City of Cincinnati* involves a four step analysis. First, in order to be protected commercial speech, it "must concern lawful activity and not be misleading." *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351. There is no question that passing on to consumers the economic burden of the gross revenue tax is lawful. The statute specifically allows that Minn.Stat. § 295.582. The Commissioners argue, however, that an itemized bill would be misleading because consumers would think that the itemized tax was a sales tax. If there was some showing that supported that contention, regulation of the itemized bills might be constitutionally appropriate. "The government may ban forms of communication more likely to deceive the public than to inform it." *Central Hudson*,

447 U.S. at 563, 100 S.Ct. at 2350. However, the court cannot agree with the Commissioners' assessment that an itemized bill will be necessarily misleading. A bill which accurately states the amount and the nature of the charge is not inherently misleading. Additionally, the Commissioners conceded at oral argument that health care providers could place an insert in an envelope along with a bill which stated that an unspecified portion of the invoice included part of the gross revenue tax. The court finds that this is far more likely to mislead and misinform the public than a simple statement that a specific dollar amount was charged due to the gross revenue tax. Accordingly, the court finds that even if it is commercial speech, an itemized statement of the tax is constitutionally protected because it would be lawful and not misleading.

 The second analytical step in the *Central Hudson* test is to determine whether the state interest is substantial. *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351. The Commissioners' expressed interest is preventing the dissemination of misleading information. At oral argument this was put in terms of consumers not being led to believe that there was a state-imposed tax on the transaction for which they were being billed. Promoting the conveyance of accurate information, especially in the provision of medical services, is a substantial interest. Therefore, the court finds that the state's articulated interest is substantial.

 A third analytic step is necessary when the proscribed speech concerns a lawful activity and is not misleading and the state has a substantial interest. This third inquiry asks "whether the regulation directly advances the governmental interest." *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351. A regulation does not pass this test "if it provides only ineffective or remote support for the government's purpose." *Id.*, 447 U.S.

at 556, 100 S.Ct. at 2343. The court is not to uphold "regulations that only indirectly advance the state interest involved." *Id.* The court finds that, if the state's interest is in preventing the dissemination of false information, then the statute fails to meet the test of this third step in the *Central Hudson* analysis because it is likely to be ineffective. The statute apparently allows health care providers to tell consumers anything they wish about the gross revenue tax, except the itemized amount of the tax which the consumer is required to pay as part of a medical bill. This is hardly an effective means to accurately convey the information which is of most concern to individual consumers, that is, the amount of money which the consumer is paying to offset the health care provider's gross revenue tax.

 The fourth step in analyzing the regulation of commercial speech is examining whether there is a "reasonable fit" between the regulation and the state's interest. *Fox*, 492 U.S. at 480, 109 S.Ct. at 3034; *City of Cincinnati*, —— U.S. at ——, 113 S.Ct. at 1510.[1] "[T]he State bears the burden of justifying its restriction ... by affirmatively establish[ing] the reasonable fit." *Fox*, 492 U.S. at 480, 109 S.Ct. at 3034. The state may demonstrate this by showing that the regulation "is proportional to the interest served." *Id.* A regulation which is "substantially excessive" is constitutionally infirm. *Id.*, 492 U.S. at 479, 109 S.Ct. at 3034. Here, the state's asserted interest is preventing consumers from receiving misleading information. More specifically, the Commissioners claim that an itemized statement of the amount of the gross revenue tax which is being voluntarily passed along to consumers by health care providers seeking to recoup their expenses might be misconstrued by consumers as state-imposed sales tax on the transaction. The court finds that a total prohibition on itemizing the tax on a state-

1. Language in earlier Supreme Court decisions appeared to indicate that a regulation which met all of the other factors in commercial speech analysis, but was not the least restrictive means available, should be held unconstitutional. *See, e.g. Central Hudson*, 447 U.S. at 556, 100 S.Ct. at 2343 ("[I]f the government interest could be served as well by a more limited restriction on

commercial speech, the excessive restrictions cannot survive."). Writing for the court in *Fox*, Justice Scalia indicated that the test was not as restrictive as this language appears to indicate. Rather, the test was one for a "reasonable fit" between the restriction and the state's interest. *Fox*, 492 U.S. at 476–81, 109 S.Ct. at 3032–3036.

ment is substantially excessive and is therefore not proportional to the state's interest. A clearly stated charge on an itemized bill is not necessarily misleading. In fact, the total prohibition on informing the individual consumer of the amount of the health care provider's tax which is being passed along to that consumer prevents the disclosure of information which that consumer would want to receive and the health care provider would want to provide. Given the political overtones of such information, health care providers may have an incentive to insure that consumers are accurately informed that the tax they are being asked to share is a new tax, rather than the sales tax to which the public may be accustomed. Thus, the state's interest in providing accurate information does not require the imposition of this substantially excessive prohibition.

In considering the four factors used to analyze commercial speech, the court finds that, although the state has asserted a substantial interest, the speech being regulated is lawful and not misleading. Furthermore, the prohibition does not bear a direct relationship to the state's interest and it is substantially excessive. Accordingly, the court finds that the plaintiffs are likely to prevail on the merits. Therefore, the third *Dataphase* factor weighs in favor of granting plaintiffs the preliminary injunction they seek.

### 4. The Public Interest

The final *Dataphase* factor to consider in deciding whether to grant a preliminary injunction is that of the public interest apart from the interests of the litigants themselves. In the context of granting a preliminary injunction based on a First Amendment challenge to a local ordinance, this court has recognized that upholding constitutionally protected freedoms is itself in the public interest. *ILQ Investment, Inc. v. City of Rochester*, 816 F.Supp. 516, 527 (D.Minn.1993).

Beyond this basic consideration, which would apply to any preliminary injunction protecting constitutional rights, the court finds that the public has specific interests at stake in this case. The public has an interest in obtaining full and accurate information. In the face of state government regulation of commercial speech, the United States Supreme Court has recognized that there is a "societal interest in the fullest possible dissemination of information." *Central Hudson*, 447 U.S. at 561–562, 100 S.Ct. at 2348–2350. While the Commissioners are correct when they state that the public should not be exposed to misleading information, the public nonetheless has an interest in full and accurate information. The court must never lose sight of the fact that those receiving information also have a substantial interest in the speaker's exercise of free speech rights. *See generally, City of Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, ——, 113 S.Ct. 1505, 1512, n. 17, 123 L.Ed.2d 99 (1993). There has been no showing by the Commissioners that the plaintiffs will actually disseminate false or misleading information. The Commissioners' allegation that the public interest will be harmed is not only speculative, it may obscure the harm that the public will suffer if the law is enforced.

It is well established that even in the context of commercial speech, the First Amendment protects an audience's interest in listening, as well as a speaker's interests in speaking. "The listener's interest [in commercial speech] is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue." *Bates v. State Bar of Arizona*, 433 U.S. 350, 364, 97 S.Ct. 2691, 2699, 53 L.Ed.2d 810 (1977). In this case the commercial information at stake is of interest at least to those consumers who wish to understand the bills they receive from health care providers. They have a right to know the basis of the charges they are paying. Beyond this interest of the citizen as an individual consumer, it is beyond dispute that the particular information the statute proscribes is of interest to the public as it takes part in the ongoing debate surrounding the provision and funding of health care. Plaintiffs have alleged that the regulation is simply a cynical attempt by the legislature to avoid responsibility for creating a new tax. The Commissioners have asserted that the legislature had in mind the public's

interest in accurate information. The court agrees with the litigants that the public interest is best served by allowing for the free flow of accurate information. The statute as a whole provides for a tax which will be passed along to the consuming public. It is vital to the public interest, particularly when some individuals will pay increased medical bills because of the statute, that there be full and accurate disclosure of the economic implications of the statute. Means other than censorship exist to insure that false information does not mislead the public. Thus the public interest weighs in favor of granting plaintiffs' motion for an injunction.

## CONCLUSION

Based on the foregoing analysis, the court concludes that the plaintiffs have satisfied their burden under *Dataphase* and that injunctive relief is appropriate. The court finds that the enforcement of Minnesota Statutes Section 295.53, subd. 3 should be enjoined. The court finds that because the collection of the gross revenues tax itself will not be affected by granting plaintiffs' the requested injunction, the state is unlikely to incur costs or damages if it is ultimately determined that the enforcement of Minnesota Statutes Section 295.53, subd. 3 has been wrongfully enjoined. Therefore, the security provision of Rule 65(c) of the Federal Rules of Civil Procedure is inapplicable. Accordingly, **IT IS HEREBY ORDERED** that defendant Commissioners O'Brien and Anderson or any other person or organization shall cease from enforcing or attempting to enforce Minnesota Statutes Section 295.53, subd. 3 and the rules and regulations promulgated thereunder.

## ORDER

This matter is before the court on plaintiffs' motion for a preliminary injunction. Based on a review of the file, record and proceedings herein, the court grants plaintiffs' motion.